CORRECTED

## 2014-1432

# United States Court of Appeals
# For The Federal Circuit

### INVISTA NORTH AMERICA S.À R.L.
### and AURIGA POLYMERS INC.,

*Plaintiffs-Appellees,*

v.

### M&G USA CORPORATION and M&G POLYMERS USA, LLC,

*Defendants-Appellants.*

---

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF DELAWARE IN CASE NO. 11-CV-1007,
JUDGE SUE L. ROBINSON.

---

### NONCONFIDENTIAL APPELLEES' ANSWERING BRIEF IN
### OPPOSITION TO M&G'S INITIAL APPEAL BRIEF

---

John W. Shaw
Jeffrey T. Castellano
SHAW KELLER LLP
300 Delaware Avenue, Suite 1120
Wilmington, DE 19801
Tel: (302) 298-0700

William J. Marsden, Jr.
Douglas E. McCann
Martina Tyreus Hufnal
Robert M. Oakes
Michelle Nerozzi-Ankenbrand
FISH & RICHARDSON P.C.
222 Delaware Avenue, 17th Floor
Wilmington, DE 19801
Tel: (302) 652-5070
Fax: (302) 652-0607

*Attorneys for Appellee*
*Auriga Polymers Inc.*

*Attorneys for Appellee*
*INVISTA North America S.à.r.l.*

**May 27, 2014**

14-1432

INVISTA North America v. M&G Polymers USA

**CERTIFICATE OF INTEREST**

       Pursuant to Federal Circuit Rule 47.4, counsel for the Plaintiff-Appellee INVISTA North America S.à r.l. certifies the following:

1.     The full name of every party or amicus represented by me is INVISTA North America S.à r.l.

2.     The names of the real party in interest represented by me are: N/A.

3.     INVISTA North America S.à r.l. is indirectly owned by Koch Industries, Inc., which is a privately-held corporation.

4.     The names of all law firms and the partners or associates that appeared for the parties or amicus now represented by me in the trial court or are expected to appear in this court are:

       FISH & RICHARDSON P.C.:  William J. Marsden, Jr., Douglas E. McCann, Jonathan E. Singer, John M. Farrell, Martina Tyreus Hufnal, Ellen A. Scordino, Karen Yeh, Robert M. Oakes, Michelle Nerozzi-Ankenbrand, Warren K. Mabey, Jr., Erin C. E. Battersby, Jacqueline Tio.


Dated: May 27, 2014          */s/ Robert M. Oakes*
                      William J. Marsden, Jr.
                      Douglas E. McCann
                      Martina Tyreus Hufnal
                      Robert M. Oakes
                      Michelle Nerozzi-Ankenbrand
                      Fish & Richardson P.C.
                      222 Delaware Avenue, 17th Floor
                      Wilmington, DE 19801
                      302-652-5070

                      *Attorneys for Appellee*
                      *INVISTA North America S.à r.l.*

14-1432

INVISTA North America v. M&G Polymers USA

## CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4, counsel for the Plaintiff-Appellee

Auriga Polymers Inc. certifies the following:

1.     The full name of every party or amicus represented by me is Auriga Polymers Inc.

2.     The names of the real party in interest represented by me are: N/A.

3.     Auriga Polymers Inc. is owned by lndorama Polymers PCL. lndorama Ventures PCL, a publicly-held Thai corporation, owns 10% or more of the equity interest in lndorama Polymers PCL.

4.     The names of all law firms and the partners or associates that appeared for the parties or amicus now represented by me in the trial court or are expected to appear in this court are:

| | |
|---|---|
| John W. Shaw | W. Cory Spence |
| Jeffrey T. Castellano | Reid P. Huefner |
| Shaw Keller LLP | Kirkland & Ellis LLP |

Dated:  May 27, 2014         */s/ Jeffrey T. Castellano* 
John W. Shaw
Jeffrey T. Castellano
SHAW KELLER LLP
300 Delaware Ave., Suite 1120
Wilmington, DE 19801
(302) 298-0700
*Counsel for Appellee*
*Auriga Polymers Inc.*

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ....................................................1

JURISDICTIONAL STATEMENT ......................................................1

STATEMENT OF THE ISSUES........................................................2

STATEMENT OF THE CASE.........................................................3

COUNTERSTATEMENT OF FACTS ..................................................6

I.     The '216 Patent—Novel Compositions for Plastic Packaging .......................6

II.    Appellees' Barrier Pet Products ..................................................11

III.   M&G's PoliProtect Infringes the '216 Patent ...........................................11

      A.     M&G Admits PoliProtect Contains Cobalt Salt ....................................11

      B.     M&G's Core Technical Documents State That PoliProtect Contains Cobalt Salt .........................................12

      C.     Claim Construction Was M&G's Only Defense to Infringement up to Summary Judgment...........................................13

      D.     The First New Defense: M&G Does Not Know What's In PoliProtect...................................................15

      E.     The District Court Grants Summary Judgment of Indirect Infringement...................................................16

      F.     The Second New Defense: M&G Knows What's In PoliProtect—a "Cobaltate" ...........................................17

      G.     The Third New Defense: M&G Knows What's In PoliProtect—a "Cobalt Metal".........................................18

      H.     The Court Finds Claim 4 Infringed and the Jury Finds the Asserted Claims Valid...........................................20

IV.   The District Court Properly Issues an Injunction .........................................21

SUMMARY OF THE ARGUMENT ...................................................22

ARGUMENT ...............................................................................24

I.    The District Court Properly Granted Summary Judgment of
      Indirect Infringement ..........................................................24

      A.   This Court Reviews the Record before the District
           Court ...........................................................................24

      B.   There Was No Disputed Issue of Fact That PoliProtect
           Contains the Three Claimed Components...........................25

      C.   The District Court Properly Excluded M&G's Attempt
           to Disavow Its Core Technical Documents.........................27

II.   The District Court Properly Granted Indirect Infringement of
      Claim 4 ..............................................................................29

      A.   PoliProtect Contains Between 20 – 500 Ppm Cobalt
           Salt ..............................................................................29

      B.   The District Court Properly Excluded M&G's New
           Non- Infringement Theories .............................................30

           1.   M&G's "cobalt metal" and "cobaltate" theories
                were not timely disclosed.........................................30

           2.   M&G's untimely theories are wrong ........................32

      C.   Dr. Turner's Testimony Regarding M&G's FDA
           Submission Was Proper ...................................................33

III.  The District Court Properly Construed "Copolyester
      Comprising a Metal Sulfonate Salt"........................................34

IV.   Alternative Grounds for Affirmance of the District Court's
      Infringement Finding ...........................................................38

      A.   "Composition" in the Preamble is Not Limiting..................39

      B.   "Composition" is Not Limited to a Blend...........................41

C.      Under the Proper Construction, M&G's PoliProtect
        Directly Infringes .....................................................................43

V.    The District Court Did Not Err In Denying M&G Summary
      Judgment on Lack of Enablement .....................................................44

      A.      M&G's New Enablement Argument is Untimely..............................45

      B.      The '216 Patent Need Not Enable the Unexpected
              Result of Decreased Yellowness ...........................................45

VI.   Substantial Evidence Supports the Jury's Verdict on
      Obviousness .......................................................................................47

      A.      Substantial Evidence Supported the Jury's Findings
              Regarding M&G's Asserted References ................................48

      B.      M&G Waived the Argument That Unexpected Results
              Are  Not Commensurate In Scope with the Claims ...........................50

      C.      Substantial Evidence Supported the Jury's Finding of a
              Nexus between Objective Indicia and the Claimed
              Invention.....................................................................................51

              1.      Nexus exists for unexpected results.........................................52

              2.      Nexus exists for commercial success.........................................54

VII.  The District Court Properly Granted a Permanent Injunction.....................55

      A.      Auriga Will Be Irreparably Harmed Absent an
              Injunction...................................................................................56

      B.      The Public Interest Does Not Favor M&G ...................................58

VIII. The Injunction is Properly Tailored...................................................59

IX.   M&G's Request for a Transition Period is Moot .....................................61

X.    The District Court Did Not Abuse Its Discretion by Denying
      M&G's Motion to Amend and Motion for Reargument ...............................61

CONCLUSION .................................................................................63

iii

## Table of Authorities

**Page(s)**

**Cases**

*Acumed LLC v. Advanced Surgical Servs., Inc.*,
   561 F.3d 199 (3d Cir. 2009) .......................................................................27, 34

*Allen Eng'g Corp. v. Bartell Indus., Inc.*,
   299 F.3d 1336 (Fed. Cir. 2002) ........................................................................39

*Allergan, Inc. v. Sandoz Inc.*,
   Appeal Nos. 2011-1619, -1620, -1635, -1639, 2012 U.S. App.
   LEXIS 6926 (Fed. Cir. Apr. 4, 2012) ...............................................................44

*Allergan, Inc. v. Sandoz Inc.*,
   Civ. No. 6:11-cv-441, 2013 WL 139350 (E.D. Tex. Jan. 10, 2013) .................42

*Am. Med. Sys., Inc. v. Biolitec, Inc.*,
   619 F.3d 1354 (Fed. Cir. 2010) ...................................................................39, 40

*Andersen Corp. v. Fiber Composites, LLC*,
   474 F.3d 1361 (Fed. Cir. 2007) ........................................................................41

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)..........................................................................................27

*Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*,
   672 F.3d 1335 (Fed. Cir. 2012) ........................................................................40

*Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*,
   249 F.3d 1341 (Fed. Cir. 2001) ........................................................................38

*Broadcom Corp. v. Emulex Corp.*,
   732 F.3d 1325 (Fed. Cir. 2013) ........................................................................49

*Callicrate v. Wadsworth Mfg., Inc.*,
   427 F.3d 1361 (Fed. Cir. 2005) ........................................................................43

*Carr v. Gillis Associated Indus., Inc.*,
   227 F. App'x 172 (3d Cir. 2007) ...........................................................28, 29, 32

*Catalina Mktg., Int'l, Inc. v. Coolsavings.com, Inc.*,
  289 F.3d 801 (Fed. Cir. 2002) .......................................................40

*Cent. Admixture Pharmacy Servs., Inc. v. Advanced Cardiac Solutions, P.C.*,
  482 F.3d 1347 (Fed. Cir. 2007) ...................................................63

*Crocs, Inc. v. Int'l Trade Comm'n*,
  598 F.3d 1294 (Fed. Cir. 2010) ..............................................51, 55

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*,
  676 F.3d 1063 (Fed. Cir. 2012) ...................................................51

*DeGeorge v. Bernier*,
  768 F.2d 1318 (Fed. Cir. 1985) ...................................................45

*Delaware Valley Floral Grp., Inc. v. Shaw Rose Nets, LLC*,
  597 F.3d 1374 (Fed. Cir. 2010) ...................................................62

*Dey L.P. v. Teva Parenteral Medicines, Inc.*,
  2011 WL 2461888 (N.D. W.Va. June 17, 2011) ...........................41

*Douglas Dynamics, LLC v. Buyers Prods. Co.*,
  717 F.3d 1336 (Fed. Cir. 2013) ...................................................56

*Douglas v. Owens*,
  50 F.3d 1226 (3d Cir. 1995) ........................................................62

*Eagle Comtronics, Inc. v. Arrow Commc'n Labs., Inc.*,
  305 F.3d 1303 (Fed. Cir. 2002) ...................................................63

*Ecolab, Inc. v. FM Corp.*,
  569 F.3d 1335 (Fed. Cir. 2009) ...................................................38

*Eli Lilly & Co. v. Actavis Elizabeth LLC*
  2010 WL 1849913 (D. N.J. May 7, 2010) ...................................29

*Energy Transp. Grp., Inc. v. William Demant Holding A/S*,
  697 F.3d 1342 (Fed. Cir. 2012) ..........................................45, 50, 51

*Eolas Techs. Inc. v. Microsoft, Corp.*,
  399 F.3d 1325 (Fed. Cir. 2005) ...................................................43

*Exergen Corp. v. Wal-Mart Stores, Inc.*,
575 F.3d 1312 (Fed. Cir. 2009) ........................................................62

*Genetics Inst., LLC v. Novartis Vaccines & Diagnostics, Inc.*,
655 F.3d 1291 (Fed. Cir. 2011) ........................................................52

*Gillette Co. v. Energizer Holdings, Inc.*,
405 F.3d 1367 (Fed. Cir. 2005) ........................................................41

*Grain Processing Corp. v. Am. Maize-Products Co.*,
840 F.2d 902 (Fed. Cir. 1988) ........................................................49

*In re Grasselli*,
713 F.2d 731 (Fed. Cir. 1983) ........................................................54

*Green Edge Enter., LLC v. Rubber Mulch Etc., LLC*,
620 F.3d 1287 (Fed. Cir. 2010) ........................................................46

*In re Greenfield*,
571 F.2d 1185 (C.C.P.A. 1978) ........................................................54

*Harrods Ltd. v. Sixty Internet Domain Names*,
302 F.3d 214 (4th Cir. 2002) ........................................................*passim*

*HTC Corp. v. IPCom GmbH & Co., KG*,
667 F.3d 1270 (Fed. Cir. 2012) ........................................24, 25, 30, 33

*IMS Tech., Inc. v. Haas Automation, Inc.*,
206 F.3d 1422 (Fed. Cir. 2000) ........................................................40

*Intamin Ltd. v. Magnetar Techs., Corp.*,
483 F.3d 1328 (Fed. Cir. 2007) ........................................................43

*Inwood Labs., Inc. v. Ives Labs, Inc.*,
456 U.S. 844 (1982) ........................................................48

*J.T. Eaton & Co., Inc. v. Atl. Paste & Glue Co.*,
106 F.3d 1563 (Fed. Cir. 1997) ........................................................58

*In re Kao*,
639 F.3d 1057 (Fed. Cir. 2011) ........................................................53

*Karlin Tech., Inc. v. Surgical Dynamics, Inc.*,
    177 F.3d 968 (Fed. Cir. 1999) ........................................................................44

*Kewanee Oil Co. v. Bicron Corp.*,
    416 U.S. 470 (1974)........................................................................................58

*Leader Techs., Inc. v. Facebook, Inc.*,
    678 F.3d 1300 (Fed. Cir. 2012) ....................................................................47

*Leo Pharm. Prod., Ltd. v. Rea*,
    726 F.3d 1346 (Fed. Cir. 2013) ....................................................................51

*Lighting Ballast Control, LLC v. Philips Elecs. N. Am. Corp.*,
    744 F.3d 1272 (Fed. Cir. 2014) (en banc) ....................................................34

*Lightning Lube, Inc. v. Witco Corp.*,
    4 F.3d 1153 (3d Cir. 1993) .....................................................................47, 54

*Liquid Dynamics Corp. v. Vaughan Co., Inc.*,
    449 F.3d 1209 (Fed. Cir. 2006) ...........................................................45, 46, 47

*LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc.*,
    275 F.3d 1347 (Fed. Cir. 2001) ....................................................................47

*Long v. Atl. City Police Dep't*,
    670 F.3d 436 (3d Cir. 2012) .........................................................................62

*Mars, Inc. v. H.J. Heinz Co., L.P.*,
    377 F.3d 1369 (Fed. Cir. 2004) ...............................................................35, 36

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
    579 F.3d 1363 (Fed. Cir. 2009) ....................................................................26

*Mason v. S. Illinois Univ. at Carbondale*,
    233 F.3d 1036 (7th Cir. 2000) ......................................................................34

*Metabolite Labs., Inc. v. Laboratory Corp. of Am. Holdings*,
    370 F.3d 1354 (Fed. Cir. 2004) ....................................................................60

*Neupak, Inc. v. Ideal Mfg. & Sales Corp.*,
    41 Fed. App'x 435 (Fed. Cir. 2002) ..............................................................54

*Newman v. GHS Osteopathic, Inc.*
   60 F.3d 153 (3d Cir. 1995) ................................................29

*Oakley, Inc. v. Sunglass Hut Int'l,*
   316 F.3d 1331 (Fed. Cir. 2003) ...........................55, 59, 60

*Omega Eng'g, Inc. v. Raytek Corp.,*
   334 F.3d 1314 (Fed. Cir. 2003) ........................................38

*Pac-Tec, Inc. v. Amerace Corp.,*
   903 F.2d 796 (Fed. Cir. 1990) .........................................61

*In re Peterson,*
   315 F.3d 1325 (Fed. Cir. 2003) ........................................54

*PIN/NIP, Inc. v. Platte Chem. Co.,*
   304 F.3d 1235 (Fed. Cir. 2002) ..................................42, 43

*Pitts v. Delaware,*
   646 F.3d 151 (3d Cir. 2011) .............................................47

*Procter & Gamble Co. v. Teva Pharm. USA, Inc.,*
   566 F.3d 989 (Fed. Cir. 2009) .........................................52

*Quinn v. Consol. Freightways Corp. of Delaware*
   283 F.3d 572 (3d Cir. 2002) .............................................29

*Rambus, Inc. v. Rea,*
   731 F.3d 1248 (Fed. Cir. 2013) ........................................52

*Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.,*
   725 F.3d 1377 (Fed. Cir. 2013) ........................................27

*Robert Bosch LLC v. Pylon Mfg. Corp.,*
   659 F.3d 1142 (Fed. Cir. 2011) ........................................56

*Rothman v. Target Corp.,*
   556 F.3d 1310 (Fed. Cir. 2008) ........................................52

*Sage Prods., Inc. v. Devon Indus., Inc.,*
   126 F.3d 1420 (Fed. Cir. 1997) ........................................45

viii

*Salve Regina Coll. v. Russell*,
499 U.S. 225 (1991)........................................................56, 59, 60

*Schaefer Fan Co., Inc. v. J & D Mfg.*,
265 F.3d 1282 (Fed. Cir. 2001) .......................................57

*Singh v. Brake*,
317 F.3d 1334 (Fed. Cir. 2003) .......................................47

*Smith Int'l., Inc. v. Hughes Tool Co.*,
718 F.2d 1573 (Fed. Cir. 1983) .......................................58

*Sourceone Global Partners LLC v. KGK Synergize, Inc.*,
2010 WL 2232944 (N.D. Ill. June 3, 2010).......................41

*Tec Air, Inc. v. Denso Mfg. Michigan Inc.*,
192 F.3d 1353 (Fed. Cir. 1999) .......................................54

*Trading Techs. Int'l, Inc. v. eSpeed, Inc.*,
595 F.3d 1340 (Fed. Cir. 2010) .......................................43

*Tristrata Tech., Inc. v. Mary Kay, Inc.*,
423 F. Supp. 2d 456 (D. Del. 2006)..................................60

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*,
587 F.3d 1339 (Fed. Cir. 2009) .......................................63

*Unigene Labs., Inc. v. Apotex, Inc.*,
655 F.3d 1352 (Fed. Cir. 2011) .......................................62

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996) .........................................36

**Statutes**

28 U.S.C. §1295(a)(1).......................................................1

28 U.S.C. §§ 1331 and 1338.............................................1

35 U.S.C. § 283.................................................................61

**Other Authorities**

Fed. R. Civ. P. 50(a).........................................................30

Fed. R. Civ. P. 56 ...................................................................................................27

MPEP §2111.03 ....................................................................................................36

MPEP §2164.08 ....................................................................................................45

Confidential information on pages 4-6, 11-15, 17-20, 22-26, 28, 31-34, 37, 57 and 60 of this Brief that was designated by the parties as confidential pursuant to the Protective Order entered in INVISTA North America S.à r.l. et al. v. M&G USA Corporation et al., C.A. No. 11-1007-SLR (D. Del.) has been redacted in this non-confidential Brief.

## STATEMENT OF RELATED CASES

There are no other related cases pending in this Court or any other court that will be affected by this Court's decision in this appeal.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this case under 28 U.S.C. §§ 1331 and 1338. On June 25, 2013, the district court entered summary judgment of indirect infringement of claims 1-3, 5, 8, 9 and 12 of the '216 patent and summary judgment of no direct infringement of claims 1-5, 8, 9 and 12 of the '216 patent. (A102-03.) The district court denied summary judgment of invalidity and granted summary judgment that the asserted claims of the '216 patent are not invalid on grounds of obviousness or failure to disclose sodium acetate. *Id.* On July 23, 2013, the district court granted judgment as a matter of law that claim 4 of the '216 patent is indirectly infringed. (A13626 (977:8-978:23).) On July 24, 2013, the jury returned a verdict that the patent is not invalid as obvious, or invalid for lack of enablement or written description. (A10689-91.) The district court decided post-trial motions, including granting INVISTA's motion for an injunction, on April 1, 2014, final judgment was entered the same day, and an injunction order issued April 21, 2014. (A163; A164-66.) M&G timely appealed these judgments.

INVISTA believes this Court has jurisdiction under 28 U.S.C. §1295(a)(1).

## STATEMENT OF THE ISSUES

1.     Whether the district court properly granted summary judgment that M&G indirectly infringes claims 1-3, 5, 8, 9 and 12 of the '216 patent, and judgment as a matter of law that M&G indirectly infringes claim 4 at trial, when M&G's only timely defenses to infringement were its proposed claim constructions and its expert's opinion that some, but not all, of the cobalt salt complexes into another cobalt salt, and whether the district court was within its discretion to exclude M&G's new non-infringement theories first disclosed on the eve of trial, and at trial.

2.     Whether the district court properly construed the term "copolyester comprising a metal sulfonate salt," to mean a copolyester with a metal sulfonate salt polymerized into the backbone of the copolyester, consistent with the patent specification, all the embodiments disclosed in the specification, and the prosecution history.

3.     Whether the district court erred in limiting the invention by narrowly construing the preamble term "composition" to only cover blends and not co-extrusions without a disclaimer in the specification or reliance on the term in the prosecution history and whether a finding of direct infringement should be directed because M&G's PoliProtect is a "composition."

4.      Whether the asserted claims are enabled when a person of ordinary skill in the art can make and use the invention, as claimed, regardless of whether the specification teaches a person of skill in the art about the unclaimed unexpected results.

5.      Whether substantial evidence, including the testimony of two Ph.D. inventors and one expert with over 30 years of industry experience, supported the jury's verdict that the claimed invention is not obvious.

6.      Whether the district court appropriately exercised its discretion in granting a narrowly tailored injunction when M&G and Auriga are direct competitors in the U.S. market and M&G's manufacture, use, sale and exportation of PoliProtect induces and contributes to infringement of the '216 patent.

7.      Whether the district court acted within its discretion by denying M&G's motion to amend the answer filed on the eve of trial, and by denying M&G's motion for reconsideration of its motion to compel, which did not comply with the Protective Order in this case.

## STATEMENT OF THE CASE

This is a case where infringement is clear.  As early as its Answer, M&G admitted a key fact that establishes its infringement—that the accused PoliProtect[1]

---

[1] INVISTA uses the same abbreviations set forth in M&G's Brief for Defendants-Appellants ("Brief") at x-xi herein.

products contain ███████████████████ (A14154-74 (A14157 ¶15);

A337-55 (A340 ¶15).)  M&G told the FDA, which approved PoliProtect to make

plastic containers that contact foods and beverages, ██████████

████████████████████ (A14047-69 (A14054); A13432-34 (445:8-

450:18).)  M&G produced product specifications in this case ("Core Technical

Documents") ███████████████ and verified that these specifications

reflect the composition of PoliProtect.  (A4543-70 (A4548-49); A4572-603

(A4573-74); A2-14 (A11-13).)  Yet, on appeal, M&G spends over half its brief

arguing to this Court that PoliProtect does not contain ████████████ and

instead contains cobalt metal (Brief at 3-9)—an untimely defense struck by the

district court that is also scientifically baseless, as INVISTA's expert established at

trial.

The reason for M&G's about-face is simple.  Throughout fact and expert

discovery and summary judgment proceedings, M&G's only defense to

infringement of the '216 patent was its proposed claim constructions.  (A11-14;

A14457-80 (A14472 at 62:18-64:10).)  For the "cobalt salt" claim element, M&G

advanced an untenable construction intended to read out █████████████ from

the scope of the claims.  (A2096-100 (A2098).)  When M&G lost its claim

construction, liability became a simple exercise based on the documents describing

PoliProtect.  But M&G—evidently not prepared to stake its case on invalidating

inventions that solved a longstanding problem in plastic packaging—tried to salvage infringement by disavowing its repeated admissions and taking a series of contradictory positions that plainly cannot all be true.

First, M&G said, contrary to its Answer, its interrogatory responses, and its statements to FDA, that M&G *did not test* the finished PoliProtect pellets and so actually had no idea whether there was ████████████ in PoliProtect. (A14556-86 (A14582 at 103:4-105:10); A8284-310 (A8285-88); A8197-222 (A8216-19).) The district court rejected this "absence of evidence" defense at the summary judgment hearing. M&G then changed tack and took the opposite position, claiming it *did test* the finished pellets and that a new witness, Dr. Rollick, could opine that ████████████████████ ████████████ The district court struck Dr. Rollick. M&G then said (during the trial) that yet another new witness, Mr. Ryba, could testify to what was in the finished product, ████████████████████ ████████████ The district court struck Mr. Ryba. The district court was within its discretion to act—it is hard to imagine how it could do otherwise and maintain the integrity of the proceeding and respect for the rules that govern civil litigation.

M&G's tactics have continued on appeal. Its arguments that the '216 patent does not enable the full scope of metal sulfonate salts, and that the patent's

unexpected results are not commensurate with the claims, are raised for the first time on appeal.  M&G argues for a construction of "copolyester comprising a metal sulfonate salt" that contradicts the intrinsic record, and renders the patent inoperable.  ███████████████████████████████  And M&G argues against the injunction based on a declaration it submitted unsolicited to the district court three weeks *after* the district court granted INVISTA's injunction motion.

The '216 patent claims novel compositions that provide containers with excellent barrier properties, reduced yellowness and haze, and solved a longstanding problem in the plastic packaging industry.  M&G's PoliProtect plainly infringes the valid patent.  INVISTA and Auriga respectfully request that this Court affirm the district court's judgment.

## COUNTERSTATEMENT OF FACTS

### I.    The '216 Patent—Novel Compositions for Plastic Packaging

Plastic polymers, such as polyester, are used for making food and beverage containers and offer several advantages over the use of glass or metal: they are lighter in weight, break less, and can potentially lower costs.  (A233-42 (A236).)

For all its advantages, though, plastic packaging also presents substantial challenges not found with glass or metal.  Oxygen must be kept out of food containers to prevent spoiling.  (A13350 (264:20-265:3).)  Some foods, like beer or soda, are carbonated—for these, the gas must be kept in.  (*Id.*)  Glass and metal

inherently provide these barriers but plastic is more permeable. A "passive barrier" can be added to plastic to help prevent a drink from going flat due to carbon dioxide loss. An active "oxygen scavenger" barrier reduces oxygen penetration. (A13360 (306:17-307:12).)

Unfortunately, the addition of barrier polymers can turn the packaging yellow and hazy. (A11489 (309:7-19); A13352 (272:8-273:12).) Poor color or clarity of the packaging material is unattractive to a consumer accustomed to seeing clear, transparent glass, and can affect consumer perception of the food quality. (A13364 (320:20-321:4).)

The '216 patent describes and claims polyester compositions that can be processed into monolayer containers having both active and passive barrier properties, and, surprisingly, improved color and clarity. (A233.) The claimed compositions comprise three components: (1) a copolyester that combines polyethylene terephthalate ("PET") with a metal sulfonate salt (for example, lithium SIPA); (2) a partially aromatic polyamide (such as nylon or MXD6); and (3) a cobalt salt. (A242.) The nylon serves as the passive barrier preventing carbon dioxide from escaping (and to an extent, oxygen from re-entering). The cobalt salt reacts with the nylon and scavenges oxygen, forming the active barrier. The metal sulfonate salt improves the mixing of the normally immiscible PET and nylon.

The prior art did not teach how to balance superior barrier properties against improved color and clarity. (A236.) In the early 2000s, achieving that balance was the goal of every PET packaging company. (A11302-03 (266:20-268:6); A11529 (834:21-835:16).) It took the work of inventors Dr. David Schiraldi, Dr. Leo Liu, Dr. Shell Huang, and Dr. Sanjay Mehta to find the solution.

In the mid-1980s, while working primarily with textiles in the fibers division of INVISTA's predecessor, Dr. Schiraldi had technical responsibility for a polymer called PET/SIPE—a specialty ionomer used to attract dye to textiles. (A13348-49 (259:7-260:10, 261:23-262:18); A13354 (282:19-283:3).) Over time, Dr. Schiraldi's work shifted to the growing PET food and beverage packaging business. When INVISTA's then-predecessor company set out to make a monolayer PET bottle that had both acceptable carbon dioxide and oxygen barriers and also the appearance of standard PET or glass (*i.e.*, transparent and colorless), Dr. Schiraldi was assigned to the project. (A13349 (261:5-22).) Knowing, as the whole industry did, that PET and MXD6 were immiscible and created articles with an opaque and yellow color, Dr. Schiraldi followed the conventional wisdom of altering the chemistry of PET to improve the gas barrier properties. (A13350-52 (267:8-19, 272:8-273:8).) These projects, ongoing from 1992-2002, all failed. (A13351-53 (268:14-19, 268:23-269:2, 274:13-24, 276:16-18).)

It was not until February 2002, inspired by a lecture he heard at a conference in Spain, that Dr. Schiraldi had the idea to add a third material to compatibilize the antagonistic PET and MXD6.  (A13353-54 (277:15-278:4, 281:21-282:12).) Drawing on this insight born out of his unique experience working with textiles, Dr. Schiraldi suggested testing "to determine whether PET/SIPE ionomer had a higher affinity for aromatic polyamides than unmodified PET."  (A14443-47 (A14445); A13354-55 (281:6-282:3, 284:10-14).)  Working with Dr. Mehta, Dr. Schiraldi discovered that PET/SIPE, when polymerized with MXD6 and PET, reduced haziness significantly, but the resulting polymer was still yellow. (A13356-57 (290:11-291:2, 291:5-8, 294:6-295:2).)

At this same time, Dr. Liu, under the guidance of Dr. Huang, was working on increasing the gas barrier performance of the monolayer bottles.  (A13361 (309:21-310:5).)  Dr. Liu faced challenges on this project—his most difficult project in his thirteen years in the industry.  (A13372 (354:16-355:4).)  Dr. Liu studied PET compositions and the resulting preforms—a precursor to the finished bottle and a better subject for color and clarity tests— and bottles for both barrier qualities and container appearance.  (A13364-65 (323:24-324:18).)

Dr. Liu made preforms and bottles of MXD6, PET and cobalt salt that not only met his passive barrier goals, but also greatly exceeded his oxygen barrier goals.  (A13363-64 (319:8-320:4); A14139-43.)  They were, however, yellow and

hazy compared to standard PET.  (A13364 (320:20-321:13); A14139-43.)   Dr. Liu

ultimately incorporated Dr. Schiraldi's work and created formulations of

PET/SIPE, MXD6, and cobalt salt.  (A13365-66 (326:17-329:5); A14128-38

(A14136).)  To Dr. Liu's great surprise, preforms and bottles made from the

formulation exhibited "greatly reduced [ ] haze and significantly reduced [ ]

yellowness."  (A13366-67 (329:18-330:10, 330:18-331:2, 332:1-334:22); A14106-

09; A14121-27.)

Dr. Liu's composition of PET/SIPE and cobalt salt resulted in a synergistic

reduction in the haze and yellowness of the preforms and bottles—that is, a

reduction that was more than the additive effect of the two components.  (A13367-

69 (334:23-339:10, 342:6-15).)  The result—a bottle with barriers and appearance

similar to glass, but with the advantages of plastic, was the answer the entire

industry had been seeking.  Dr. Liu, Dr. Schiraldi, Dr. Huang, and Dr. Mehta were

awarded the '216 patent for their work.

INVISTA is the owner of the '216 patent.  (A13347 (254:2-4).)  Auriga is

the exclusive licensee of the '216 patent, and the only company with rights to

practice the '216 patent in the United States.  (A13347 (252:24-253:11); A14484-

94 (A14485-86 ¶¶4-5).)

## II.    Appellees' Barrier Pet Products

Auriga markets and sells two barrier PET products in the United States:

PolyShield® and Oxyclear®.  (A14485-87 (¶¶3-9).)  PolyShield® is a copolymer

of PET and sodium SIPA blended with cobalt salt.  Oxyclear® is the same

copolymer with additional modifications.  Customers mix PolyShield® with

MXD6 nylon at the melting stage to activate the oxygen barrier.  PolyShield® plus

MXD6 is a commercial embodiment of the '216 patent.  PolyShield® and

Oxyclear® compete directly with M&G's PoliProtect in the United States and

globally.  (A14487 (¶11); A116-60 (A153-56); 13490 (575:24-576:16).)

## III.    M&G's PoliProtect Infringes the '216 Patent

On October 21, 2011, INVISTA sued M&G for infringement of the '216

patent.  (A243-50.)  Until summary judgment, M&G admitted that the accused

products contain a cobalt salt—specifically, ▮▮▮▮▮▮▮▮—but argued that

this particular salt was not covered by its construction of the claims.  The district

court rejected M&G's construction and granted summary judgment of indirect

infringement.  From that moment through trial, M&G's non-infringement position

was a moving target.

### A.    M&G Admits PoliProtect Contains Cobalt Salt

Contrary to what M&G now argues to this Court, M&G admitted in its

Answer to INVISTA's Complaint that "0.015 weight percent cobalt neodecanoate .

. . are components of PoliProtect APB and PoliProtect JB resins."  (A14157 (¶15);

11

*see also* A340 (¶15).)  Cobalt neodecanoate is indisputably a cobalt salt under the

construction adopted by the district court, which M&G has not appealed.

███████████████████████████████████ the agency responsible for

public health and safety in this country and thus a body concerned about the

chemical composition of articles used to package food.  (A14054.)

### B.    M&G's Core Technical Documents State That PoliProtect Contains Cobalt Salt

As part of the discovery process, the district court required early disclosure

of accused products by the patentee and, in turn, "the core technical documents

related to the accused product(s)" by the accused infringer.  (A330-36 (A332).)

The rationale is to "make discovery in patent litigation more efficient" by requiring

the early disclosure of key documents.  (A7914-63 (103:12-104:2, 109:22-110:9).)

M&G produced a compilation of PoliProtect product specifications as "the core

technical documents related to the accused product(s)."  (A4605-29 (A4605);

A14070-91.)  The "material description" portions of the Core Technical

Documents indicate that ████████████████████████████████████

████████████████████████ (A14078; A14082; A13431-32 (441:17-445:13).)

M&G further confirmed that the Core Technical Documents describe the

composition of PoliProtect in interrogatory responses, stating that "[t]he

composition of, and the details requested related to, Defendants' PoliProtect APB

and PoliProtect JB products" have been produced as the Core Technical

Documents.  (A4548-49; A8245-47; A11-12.)  Gianluca Ferrari, M&G's lead

scientist in the development of PoliProtect and corporate witness on the

composition of PoliProtect, ███████████████████████████████████

███████████████████████████████████████  (A8281 (14:11-20);

A14605-07 (71:15-81:3); A8204-06; A12.)  Almost a year into the case, M&G

again confirmed that INVISTA should look to the Core Technical Documents and

additional PoliProtect specifications to "ascertain composition information in

response to this interrogatory."  (A4573-74.)

###     C.    Claim Construction Was M&G's Only Defense to Infringement up to Summary Judgment

INVISTA's infringement contentions logically relied on M&G's Core

Technical Documents to identify the presence of each claim limitation, including

cobalt salt.  (A8249-76 (A8263-68).)  INVISTA served an interrogatory seeking

M&G's non-infringement contentions.  (A8231-43 (A8238).)  M&G's response

did not contend that there is no cobalt salt in PoliProtect.  Rather, M&G provided a

table that included a statement for each claim element that PoliProtect does not

contain that claim element "under the narrow scope supported by the

specification."  (A4574-92.)  M&G's proposed construction of "cobalt salt"

attempted to read out ███████████ by limiting the claim to the cobalt salts

used in the patent examples.  (A2098.)

At a hearing on September 21, 2012, two weeks before the close of fact discovery, M&G's counsel confirmed to the district court in response to the court's question about the presence of cobalt salt, that ***M&G's non-infringement position was based only on its proposed claim constructions***. (A14472 (62:18-64:10); A8209.)

INVISTA's expert, Dr. Turner, relied on the Core Technical Documents, and other documents, to demonstrate that PoliProtect met each limitation of the asserted claims. (A4358-483 (A4385-99, A4442-59).) Before serving as professor of polymer science at Virginia Tech, Dr. Turner spent over thirty years in industry working on the same polymer problems the '216 patent inventors solved. (A13425-28 (416:16-428:10).) Dr. Turner knew, based on his long industry experience, that product specifications like the Core Technical Documents are not merely a list of ingredients, but are "the definition of what is contained in the product." (A13430 (436:17-437:22); A13449 (511:5-513:8).)

M&G responded to Dr. Turner's expert report with a report from its expert, Dr. Moore.



Thus, at the close of discovery, there was no disputed fact that under INVISTA's construction of "cobalt salt"—which the district court adopted and M&G has not appealed—PoliProtect contains cobalt salt.  (A79-80.)

### D.   The First New Defense: M&G Does Not Know What's In PoliProtect

After the close of discovery, INVISTA moved for summary judgment of infringement of the '216 patent under INVISTA's constructions, citing M&G's Core Technical Documents to show each limitation was met.  (A3264-66; A3267-315.)  In response, M&G argued for the first time that its Core Technical Documents do not describe the composition of the final PoliProtect products.  (A6030-78 (A6061-63).)  At the summary judgment hearing, M&G's counsel said that M&G does not "analyze the pellet to see what is in the final pellet"—an "absence of evidence" defense.  (A14582 (103:4-105:10).)  One week later, M&G

reiterated this defense, claiming "M&G does not analyze its products to determine the final components." (A8287; A8216-19.)

INVISTA protested this untimely defense. (A8193-96; A8197-222.) The district court agreed, saying M&G's change of heart "alters the entire infringement and non-infringement landscape that was developed and vetted during fact and expert discovery." (A13.) The prejudice caused by M&G's eleventh-hour defense "would be almost impossible to cure at this stage of litigation because INVISTA has relied on the core technical documents to this stage to establish the foundation of essential evidence—the PoliProtect products' components." (A13-14.)

### E. The District Court Grants Summary Judgment of Indirect Infringement

On June 25, 2013, the district court issued its summary judgment opinion, finding under its constructions that PoliProtect contains a "partially aromatic polyamide" (A76-77), a "copolyester comprising a metal sulfonate salt" (A78-79), and, based on the record described above, a "cobalt salt" (A79-81).

The district court held that PoliProtect does not directly infringe the '216 patent solely on an incorrect construction of the term "composition." (A72-74; A15-51 (A23-29).) However, the district court found that "the only 'practical or worthwhile' use of the PoliProtect products is for them to be melted" into bottles or containers by M&G's customers, a finding M&G does not appeal. (A75-76; A82-83.) When M&G's customers melt the pellets they form a "composition" as

construed by the district court and directly infringe the '216 patent, and M&G

induces and contributes to that infringement. (A74-84.) The district court thus

granted summary judgment that M&G indirectly infringes '216 patent claims 1, 2,

3, 5, 8, 9, and 12. (A74-84.) The district court found a disputed issue of fact

regarding claim 4, which specifies a range of cobalt salt, based on Dr. Moore's

opinion that some (but not all) of the cobalt salt may complex. (A80-81.)

### F. The Second New Defense: M&G Knows What's In PoliProtect—a "Cobaltate"

After its claim construction and "absence of evidence" non-infringement

theories failed, M&G advanced new non-infringement theories with respect to the

one remaining claim, ***post-summary judgment***. Two months before trial,

INVISTA deposed Dr. Rollick, a former employee M&G had recently identified as

a trial fact witness, who has been a consultant to M&G's counsel since 2011.

(A10242-55 (A10247-49); A104-12 (A108); A14806-07 (65:19-66:11); A14813-

14 (93:17-95:6).) That deposition, and related documents M&G produced

unsolicited before the deposition, revealed M&G's latest non-infringement

theory— █████████████████████████████████

████████████████████████████████ (A10244; A14819

(116:8-24); A10013-22 (A10018-19).)

M&G's "cobaltate" theory was never disclosed in M&G's contentions or

expert reports, ████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

████████ (A10247-49; A14802-03 (46:13-50:6); A14832 (167:16-168:16);

A10018-19).)  None of this testing, M&G's "cobaltate" theory, or the data

underlying its theory was presented to the district court during summary judgment.

(A13498 (609:20-24); A111; A6030-A6078.)

       M&G's claim that it knew the cobalt salt ████████████████████

███████████████████████████ was plainly wrong (A10015;

A10249-54), and is irreconcilable with the "absence of evidence" defense it

presented to the district court one month earlier (A14582 (103:4-105:10); A10243-

44) as well as ████████████████████████████████████ (A4520;

A4524; A4900 (135:11-17); A14819 (116:8-24); A14832 (169:1-15)).  The district

court properly denied M&G's proffer of Dr. Rollick's testimony finding it was

directed to a non-infringement defense never vetted during discovery, submitted

for the first time on the eve of trial, and that "manifest injustice will inure to

INVISTA if this testimony were permitted."  (A109-A112.)

## G.   The Third New Defense: M&G Knows What's In PoliProtect—a "Cobalt Metal"

The primary non-infringement theory M&G advances to this Court—that the

cobalt salt purportedly transforms into cobalt metal in the final PoliProtect

products (Brief at 22)—was hinted at for the first time in M&G's opening

statement and articulated for the first time in the middle of trial, after probing by

the district court. (A13483 (548:6-549:12); A13450-56 (518:22-524:20, 535:8-

539:8).) M&G's counsel, who earlier represented that M&G doesn't "analyze the

pellet to see what is in the final pellet" (A14582 (103:4-105:10)), now argued that

"[t]he end product is tested for cobalt metal. They do test to determine how much

cobalt metal is in it," and proffered Mr. Ryba, a purported fact witness, to

"interpret" the Core Technical Documents for the jury. (A13452-55 (525:7-8,

534:25-335:17).)

The district court gave M&G a 45 minute recess during trial to identify

anything in the record that would show "that this isn't an issue that was sprung on

the plaintiffs at trial." (A13456-57 (541:24-543:12).) M&G was unable to identify

any disclosure of its "cobalt metal" theory. (*Id.*) Even given 24 hours, ██████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████ (A10632-39 (A10634-35); A10500-

11.) Instead, M&G cobbled together ████████████████████████

██████████████████████████████████████████████████████

██████████████ (A10635-37; A10503-04; A10507-08.) The district court rightly

found that M&G's new theory was first raised "in the middle of trial" and had

"never been appropriately vetted through discovery," and did not allow M&G to introduce it via Mr. Ryba. (A13483 (548:6-549:12).)

### H. The Court Finds Claim 4 Infringed and the Jury Finds the Asserted Claims Valid

At trial, Dr. Turner testified that PoliProtect infringes claim 4 of the '216 patent based on the range of cobalt salt identified in the Core Technical Documents, and M&G's admissions in this case ███████████ that the final PoliProtect products contain cobalt salt (not cobalt metal) within the claimed range. (A13431-33 (441:17-445:13); A14078; A14082; A14157 (¶15); A14054.) On cross-examination, Dr. Turner explained that M&G's new "cobalt metal" theory is scientifically wrong, explaining that cobalt is an ion, and that "no ion can exist by itself. You have both the anion and the cation. That's the salt." (A13448 (508:23-509:22).) Dr. Moore testified that ████████████████████ ████████████████████████████████████████████████ (A13499 (612:10-16).) After the close of the evidence at trial, the district court granted INVISTA's motion for infringement of claim 4 as a matter of law. (A13626 (977:8-978:23).)

After hearing the testimony of Drs. Schiraldi, Liu, Turner, and Moore, the jury returned a verdict that the patent was not invalid for obviousness, lack of written description, or lack of enablement. (A10689-91.) On March 31, 2014, the

district court denied M&G's motion for judgment of non-infringement and
invalidity as a matter of law.  (A123-49.)

## IV.    The District Court Properly Issues an Injunction

On August 26, 2013, INVISTA moved the district court for a permanent
injunction.  (A11053-76.)  With the motion, INVISTA submitted evidence
demonstrating that Auriga directly competes with PoliProtect in the United States,
that Auriga would be irreparably harmed absent an injunction, and that Auriga has
more than sufficient capacity to replace PoliProtect in the market.  (A14484-94.)

Briefing on INVISTA's motion was completed in September 2013.  Rather
than prepare its customers for what M&G now contends is irreparable harm (Brief
at 51-52), M&G "reassured" customers that they would not have to stop using
PoliProtect, and directed them to an M&G press release mischaracterizing the
verdict for INVISTA as a "quasi complete across the board defeat of INVISTA's
legal claims."  (Doc. 15, Ex. B ¶¶ 5-6; *Id*., Ex A.)

On March 31, 2014, the district court granted INVISTA's motion for a
permanent injunction.  (A150-57.)  The district court considered the evidence
presented, concluded that Auriga and M&G are direct competitors, that Auriga
would be irreparably harmed absent an injunction, and that legal remedies are
inadequate to redress Auriga's harm.  (A152-56.)  The district court considered the
same arguments M&G now makes concerning customer harm and the public

interest, and concluded that the public interest factor did not favor M&G. (A156-57; A11320-45 (A11341-43).) The district court entered an injunction order on April 21, 2014. (A164-66.)

M&G moved this Court to stay the injunction pending appeal on April 25, 2014, making many of the same arguments in its Brief. (Doc. 3.) INVISTA responded on April 30. (Doc. 28.) On May 5, this Court denied M&G's motion to stay the injunction pending appeal, finding that M&G had not shown a likelihood of success on the merits, and that the harm and public interest factors did not favor M&G. (Doc. 31 at 2.)

## SUMMARY OF THE ARGUMENT

The district court's judgment should be affirmed. M&G's PoliProtect contains each of the three components recited in the '216 patent claims, and the district court properly granted judgment of indirect infringement. M&G's Core Technical Documents demonstrate that PoliProtect contains cobalt salt, the key limitation disputed by M&G. M&G also admitted ████████ and in its Answer to INVISTA's Complaint that the final PoliProtect products contain cobalt salt. After M&G's claim construction-based defenses failed at summary judgment, M&G advanced a series of new non-infringement theories related to the cobalt salt limitation that were never vetted in discovery, and were first disclosed on the eve of, and in the middle of, trial. These new theories are scientifically wrong and

22

CONFIDENTIAL INFORMATION REDACTED

irreconcilable with each other, and their presentation would have severely

prejudiced INVISTA.  The district court did not abuse its discretion in excluding

the untimely theories.

M&G's only other non-infringement defense is a construction of

"copolyester comprising a metal sulfonate salt" that is based on a single statement

made during prosecution, is inconsistent with the whole of the intrinsic record, and

would render the patent inoperative.  ███████████████████████

████

M&G's invalidity defenses fare no better.  The discoveries claimed in the

'216 patent solved a long-standing problem in the plastic packaging industry—

packaging that provides excellent barrier properties and also reduced yellowness

and haze.  Substantial evidence supported the jury's findings that the patent is not

invalid as obvious, or as lacking enablement or written description.  M&G's

arguments improperly ask this Court to reweigh the evidence, and, just like its new

non-infringement defenses, several of M&G's invalidity arguments were never

presented to the jury or to the district court.

The district court properly exercised its discretion to issue an injunction

based on evidence that Auriga's products directly compete with M&G's

PoliProtect, that Auriga would be irreparably harmed absent an injunction, and that

the public interest does not favor M&G.  The district court's injunction is properly

tailored to redress M&G's infringement.

## ARGUMENT

I.    **The District Court Properly Granted Summary Judgment of Indirect Infringement**

A.    **This Court Reviews the Record before the District Court**

"As a general rule, an appellate court does not consider an issue not passed

upon below."  *HTC Corp. v. IPCom GmbH & Co., KG*, 667 F.3d 1270, 1281-82

(Fed. Cir. 2012); *see also Harrods Ltd. v. Sixty Internet Domain Names,* 302 F.3d

214, 242 (4th Cir. 2002).  This Court's review of the district court's summary

judgment decision is based on the record before the district court on summary

judgment, not on non-infringement theories M&G could have, but did not raise.

*Id.*

The non-infringement defenses M&G raised before summary judgment were

its claim construction-based defenses and Dr. Moore's opinion ████████████

█████████████████████████████████████████ (A14472 (62:18-64:10);

A8209; A13; A79-A80; A4898-99 (129:22-130:15).)  During summary judgment

briefing, M&G for the first time asserted its "absence of evidence" defense that its

Core Technical Documents do not reflect the final PoliProtect products.  (A6061-

63; A14582 (103:4-105:10).)  Although M&G attempts to conflate Dr. Moore's

opinions with its untimely "cobaltate" and "cobalt metal" theories (Brief at 37-38),

those theories are completely different (A4520; A4524; A4900 (135:11-17);

A14819 (116:8-24); A14832 (169:1-15)). M&G's inability at trial to find a single

place in the discovery record where the cobalt metal theory was disclosed

conclusively shows that it is new. (A13456-57 (541:24-543:12).) Because the

"cobalt metal" and "cobaltate" theories were not disclosed during discovery and

were never presented to the district court during summary judgment (A13498

(609:20-24); A111; A13483 (548:6-549:12).), they cannot serve as a basis to

appeal the district court's summary judgment decision. *HTC*, 667 F.3d at 1281-82;

*Harrods,* 302 F.3d at 242.

### B. There Was No Disputed Issue of Fact That PoliProtect Contains the Three Claimed Components

This is a clear case of infringement: there were no genuine disputed issues of

fact that PoliProtect contains each of three claimed components, and M&G admits

that its customers melt the pellets to form the recited composition. (A74-84; Doc.

2 at 3.) M&G's contention that "INVISTA did not present, and indeed does not

have, any data to show if any cobalt salt remains in the final PoliProtect product"

(Brief at 31-32) ignores what M&G ████████████ and its own admission that

"*0.015 weight percent cobalt neodecanoate*"—a cobalt salt—"*are components of*

*PoliProtect APB and PoliProtect JB resins*." (A14167 (¶15); A340 (¶15);

A14054.) The presence of cobalt salt is also confirmed by the Core Technical

CONFIDENTIAL INFORMATION REDACTED

Documents, which M&G verified reflect the composition of the final PoliProtect products.  (A14078; A14082; A4548-49; A11-14.)

INVISTA and its expert, Dr. Turner, did not need to test PoliProtect (Brief at 30), because substantial evidence and M&G's admissions established the presence of cobalt salt.  (A14078; A14082; A14167 (¶15); A340 (¶15); A14054; A6675-77; A6692-93; A6702; A13431-34.)  "A patentee may prove infringement by any method of analysis that is probative of the fact of infringement."  *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1372 (Fed. Cir. 2009).

Dr. Moore provided no "conflicting opinions" on summary judgment, and the district court did not "weigh the credibility of the experts."  (Brief at 32.)  ███

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████  There was no genuine disputed issue of fact that the final PoliProtect products contain cobalt salt.  (A79-80.)  The district court also did not "discount the testimony of Dr. Moore" (Brief at 32)—the district court considered every citation to Dr. Moore's testimony in the summary judgment record.  (A106.)  "M&G's attempt to create an opinion from an expert who has provided sworn testimony that he has no opinion on the relevant issue cannot

sustain a motion for reconsideration or create any credibility issues for a jury."

(A107.)

Nor did the district court shift the burden of proof on infringement to M&G.

(Brief at 30.)  "Throughout its analysis, the court did not waver from the principle

that INVISTA carries the ultimate burden by a preponderance of the evidence."

(A107.)  After INVISTA presented a prima facie case for summary judgment, the

district court concluded that M&G failed to raise any genuine issues of fact for trial

(A107; A74-84), and properly granted judgment of indirect infringement.  Fed. R.

Civ. P. 56; *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-49 (1986).

### C.    The District Court Properly Excluded M&G's Attempt to Disavow Its Core Technical Documents

The district court properly excluded M&G's belated effort to create a non-

infringement defense by arguing its Core Technical Documents are lists of

ingredients and that M&G has no idea what is in its final PoliProtect products.

(Brief at 34; A6061-63; A6079-89 (A6086-87 ¶13); A8287-88; A14582 (103:4-

105:10).)  This Court applies regional circuit law to review the district court's

exclusion of evidence.  *Rembrandt Vision Techs., L.P. v. Johnson & Johnson*

*Vision Care, Inc.*, 725 F.3d 1377, 1380 (Fed. Cir. 2013).  The Third Circuit

reviews evidentiary rulings under an abuse of discretion standard.  *Acumed LLC v.*

*Advanced Surgical Servs., Inc.*, 561 F.3d 199, 211 (3d Cir. 2009).

The proposition that a company making chemical compositions to package foods does not know what is in those products (Brief at 7, 18) is absurd. M&G knew that cobalt salt was in the final PoliProtect products when ███████████ ███████████ and even admitted that fact twice in this case before reversing course and arguing there is no cobalt salt. (A14157 (¶15); A340 (¶15).) Scientists working in this field, like Dr. Turner, know that the product specifications in M&G's Core Technical Documents are not merely lists of ingredients, but are "the definition of what is contained in the product." (A13430 (436:17-437:22); A13449 (511:5-513:8).)

"District courts have broad discretion to disallow the addition of new theories of liability at the eleventh hour." *Carr v. Gillis Associated Indus., Inc*., 227 F. App'x 172, 176 (3d Cir. 2007). This defense, including Dr. Moore's new declaration and M&G's supplemental interrogatory response, was raised months after the close of discovery, three months before trial. (A6086-87 (¶13); A8287-88.) M&G's contention that it had "no understanding" that INVISTA relied on the Core Technical Documents to demonstrate the presence of cobalt salt until the district court's rulings (Brief at 35-36) is not credible. INVISTA's infringement contentions and expert report made INVISTA's reliance on the Core Technical Documents clear, and the representations of M&G and its witnesses justified

INVISTA's reliance.  (A4548-49; A8263-68; A14472 (62:18-64:10); A4385-95; A4407-83; A11-14.)

This district court did not abuse its discretion in excluding M&G's eleventh-hour defense because it "alters the entire infringement and non-infringement landscape that was developed and vetted during fact and expert discovery" and the prejudice to INVISTA "would be almost impossible to cure" post-summary judgment, three months before trial.[2]  (A13-14); *Carr*, 227 F. App'x at 176.

## II.     The District Court Properly Granted Indirect Infringement of Claim 4

### A.     PoliProtect Contains Between 20 – 500 Ppm Cobalt Salt

INVISTA presented substantial evidence at trial, described above, demonstrating that PoliProtect contains from about 20 to about 500 ppm of cobalt salt, as required by claim 4.  (A13431-34 (441:17-450:20); A14078; A14082; A14157 (¶15); A340 (¶15); A14054.)  M&G presented no evidence to the contrary.  (A13499 (612:10-16).)  The district court properly concluded that the jury did not have a legally sufficient basis to find for M&G on infringement of claim 4

---

[2] The cases M&G cites concerning exclusion of evidence (Brief at 33-34) are inapposite.  *Newman v. GHS Osteopathic, Inc.* holds that a district court did not abuse its discretion by declining to exclude testimony that was not prejudicial to the plaintiff.  60 F.3d 153, 156 (3d Cir. 1995).  *Quinn v. Consol. Freightways Corp. of Delaware* was a sexual harassment case where no surprise or prejudice would have resulted from the excluded testimony.  283 F.3d 572, 577-78 (3d Cir. 2002).  In *Eli Lilly & Co. v. Actavis Elizabeth LLC*, the prejudice from non-disclosure could be cured via a deposition.  2010 WL 1849913, at *9-10 (D. N.J. May 7, 2010).

(A13626 (977:8-978:23)), and granted judgment for INVISTA as a matter of law.

Fed. R. Civ. P. 50(a).

## B. The District Court Properly Excluded M&G's New Non-Infringement Theories

Because infringement on the record before the district court is clear, M&G's

Brief focuses on undisclosed non-infringement theories—the "cobalt metal" theory

advanced through Mr. Ryba and the "cobaltate" theory advanced through Dr.

Rollick—that the district court properly excluded. (Brief at 2-6, 8-9.) Neither of

these theories was presented to the district court on summary judgment (A13483

(548:6-549:12); A13498 (609:20-24); A111), thus their exclusion is relevant only

to infringement of claim 4, not to the district court's summary judgment decision.

*HTC*, 667 F.3d at 1281-82; *Harrods,* 302 F.3d at 242.

### 1. M&G's "cobalt metal" and "cobaltate" theories were not timely disclosed

In the words of M&G's counsel, Dr. Rollick's "cobaltate" theory "was post

all the summary judgment proceedings and everything, and that didn't take place

until long after summary judgment briefing was taken, summary judgment hearing

was had in this court." (A13498 (609:20-24).) The "cobalt metal" theory M&G

attempted to introduce via Mr. Ryba "was raised in the middle of trial." (A13483

(548:6-14).)

M&G's argument that its "cobalt metal" theory was disclosed in August 2012 (Brief at 36-38) is not true. At trial, M&G's counsel could not identify a single reference to its "cobalt metal" theory in the evidentiary record. (A13456-57 (541:24-543:12)).

M&G's suggestion that Dr. Moore disclosed its current theory (Brief at 37-38) is also untrue.

contradict M&G's current argument that the cobalt is present in its free, metal form. (A4520; A4524; A4898-900 (129:22-130:15, 135:11-17); A10272-74; A14819 (116:8-24); A14832 (169:1-15); Brief at 22.)

M&G's "cobaltate" and "cobalt metal" non-infringement theories were proffered on the eve of and in the middle of trial, respectively. (A13483 (548:6-14); A13498 (609:20-24); A111.) The district court did not decide to exclude these theories lightly, and entertained both argument and briefing on the issues. (A126.) The district court did not abuse its discretion by excluding these eleventh-hour defenses. *Carr*, 227 F. App'x at 176.

### 2. M&G's untimely theories are wrong

This is not a case where excluding M&G's untimely theories may have led to an incorrect decision on infringement. M&G's current argument that "PoliProtect contains only cobalt metal ions" (Brief at 22) is scientifically wrong. As INVISTA's expert explained on cross-examination, cobalt does not exist alone. (A13448 (508:23-509:22).) Rather, cobalt is an ion, and "no ion can exist by itself. You have both the anion and the cation. That's the salt." (*Id*.)

M&G's Core Technical Documents disclose that cobalt is present ███████ ███████—i.e., as cobalt salt, not cobalt metal. (A14078; A14082.)

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████ M&G's test method

for cobalt, M&G/QC-07 (Brief at 19), was never admitted at trial or cited in

M&G's proffer of Mr. Ryba (A11555-74 (A11567-68)), and this Court should not

entertain argument regarding it. *HTC*, 667 F.3d at 1281-82.

### C. Dr. Turner's Testimony Regarding M&G's FDA Submission Was Proper

M&G's argument that Dr. Turner testified outside the scope of his expert

report (Brief at 39-40) is also wrong. As M&G concedes, the FDA submission

was described in Dr. Turner's expert report. (A4391; A4399.) In addition to the

paragraphs cited in M&G's Brief, Dr. Turner explained that ██████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████ Dr. Turner considered M&G's FDA submission in forming his opinions.

(*Id.*)

Dr. Turner opined that PoliProtect infringes claim 4 based on the Core

Technical Documents alone. (A13431-32 (441:17-445:13).) Moreover, M&G's

---

3 ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████

Answer admits ███████████████████████—that the final

PoliProtect products contain 0.015 weight percent, or 150 ppm, cobalt

neodecanoate.  (A13433-34 (449:5-450:12); A14157 (¶15); A340 (¶15); A14054.)

M&G was not prejudiced by presentation of its cumulative admission to the FDA,

and the district court did not abuse its discretion by overruling M&G's objection.

*Acumed*, 561 F.3d at 211; *Cf. Mason v. S. Illinois Univ. at Carbondale*, 233 F.3d

1036, 1047-48 (7th Cir. 2000) (no error in exclusion of cumulative evidence).

### III.    The District Court Properly Construed "Copolyester Comprising a Metal Sulfonate Salt"

M&G's second non-infringement argument, centered on its strained claim

construction, fails as well.  M&G's only support for a construction that would

render the '216 patent nonsensical and read out every embodiment in the

specification is one, out-of-context statement in the prosecution history.  When the

entire intrinsic record, including the specification and the full prosecution history,

is considered, it is evident that the district court properly construed "copolyester

comprising a metal sulfonate salt" to mean a copolyester including, but not limited

to, a metal sulfonate salt.   Claim construction is reviewed *de novo*.  *Lighting

Ballast Control, LLC v. Philips Elecs. N. Am. Corp.*, 744 F.3d 1272, 1276-77 (Fed.

Cir. 2014) (en banc).

The asserted claims use the transitional phrase "comprising."  This term is

well understood to be an open-ended term meaning that "the named elements are

34

essential, but other elements may be added and still form a construct within the scope of the claim." *Mars, Inc. v. H.J. Heinz Co., L.P.*, 377 F.3d 1369, 1375-76 (Fed. Cir. 2004). In the context of polymer science, if a copolyester "comprises" a certain functional group, it means that functional group is polymerized into the backbone, but there may be other different functional groups as well.

The '216 patent demonstrates this understanding. The specification explains the process through which functional groups, including the metal sulfonate salt, are linked or incorporated into a polyester backbone (a process called polymerization) to create a "copolyester comprising a metal sulfonate salt." It describes a "sulfomonomer" comprised of a "metal sulfonate salt group" and an "aromatic nucleus." (A237-38 (4:67-5:9).) The metal sulfonate salt group is attached to the aromatic acid nucleus portion of the sulfomonomer. (A237-38 (4:67-5:2); A242 (14:20-24).) The examples describe a series of copolyesters comprising a polyester and a sulfomonomer (either 5-sodiumsulfoisophthalic acid or 5-zincsulfoisophthalic acid) that were made by melt phase polymerization "conducted in the normal way." (A239 (8:39-43).)

The specification and claims demonstrate that the metal sulfonate salt is polymerized into the copolyester backbone. (A237-39 (4:67-5:9, 8:39-43).) If the term were construed to mean the metal sulfonate salt is not attached to the copolyester, it would read out every embodiment disclosed in the patent, including

35

the preferred embodiment. Such a construction "is rarely, if ever, correct" and would require "highly persuasive evidentiary support" in order to be adopted. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996). M&G has no such evidence.

The only support M&G has for its position is a single, out-of-context sentence in a response to an office action. However, when that office action and response are viewed in their entirety, the prosecution history is consistent with the specification and INVISTA's construction, not M&G's. In a rejection, the Examiner stated that, with respect to pending claim 31 ('216 patent claim 1), it was unclear whether the metal sulfonate salt is attached to the copolyester. (A2345-52 (A2347).) In the same office action, the Examiner stated that, with respect to pending claim 39 ('216 patent claim 9), it was unclear how the metal sulfonate salt is attached to the aromatic acid nucleus. (A2348.) The applicant's response was twofold. First, the applicant amended the claim to use "comprising" instead of "containing" and stated that the metal sulfonate salt is not attached to the copolyester—the one sentence relied upon by M&G. The change from "containing" to "comprising" does not change the original meaning of the claim because these terms are synonymous. *Mars*, 377 F.3d at 1375-76; MPEP §2111.03. As for the statement M&G relies on concerning whether the metal sulfonate salt is attached to the copolyester, the applicant went on to explain that

the metal sulfonate salt was attached to the copolyester via the aromatic ring of the

respective sulfonic acid and that this was common knowledge to a person of skill

in the art:

> Regarding Claim 39, a person of skill in the art would know the arrangement of the metal sulfonate salt based on the claims as written and the specification. Specifically, the metal sulfonate salt is attached to the aromatic ring of the respective sulfonic acid. For example, when the aromatic acid nucleus is 5-sulfoisophthalic acid (see structure below) and the metal is sodium, the sodium sulfonate salt is attached to the aromatic ring (see structure below). This is all common knowledge to those of skill in the art.



5-Sulfoisophthalic acid          sodium dimethyl 5-sulphonatoisophthalate

(A2369-88 (A2370-71)).

Because the aromatic acid nucleus is incorporated into, and so made part of,

the polyester backbone during polymerization (A239 (8:39-43)), the metal

sulfonate salt group is necessarily attached to the copolyester. M&G's

construction requiring that the metal sulfonate salt not be attached to the

copolyester at all is overly narrow and inconsistent with the intrinsic record. ███

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████

At a minimum, the single, isolated statement M&G relies on does not rise to the level of a "clear and unmistakable" disavowal of claim scope. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325-26 (Fed. Cir. 2003); *see also Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d 1341, 1347-48 (Fed. Cir. 2001) (finding no disclaimer where an erroneous statement was "contrary not only to the plain language of the claims and the specification, but also to other statements in the same prosecution document"). The patent claims and specification, the primary sources of intrinsic evidence, consistently show the metal sulfonate salt is attached to the copolyester, and the prosecution history, read as a whole, is consistent with that meaning. *See Ecolab, Inc. v. FM Corp.*, 569 F.3d 1335, 1342 (Fed. Cir. 2009) ("Even if an isolated statement appears to disclaim subject matter, the prosecution history as a whole may demonstrate that the patentee committed no clear and unmistakable disclaimer.").

## IV. Alternative Grounds for Affirmance of the District Court's Infringement Finding

The district court granted M&G's motion for summary judgment of no direct infringement based solely on the construction of the term "composition." (A72-74.) INVISTA proposed that the term, which appears in the preamble, is either not limiting or has its ordinary meaning. M&G argued that composition must be a blend of ingredients that exist together at the same time. The parties' constructions are set forth below:

| | INVISTA's Construction | M&G's Construction |
|---|---|---|
| "composition" | Plain and ordinary meaning that is the "sum of the components"; the preamble is not limiting | "a blend of two or more ingredients that exist together at the same time." |

The district court construed "composition" to mean "a blend that contains the specified ingredients at any time from the moment the ingredients are mixed together." (A29.) It found that PoliProtect, as sold by M&G, did not meet this construction because the PoliProtect pellets have two layers, an outer layer containing various components and an inner layer made of partially aromatic polyamide, which are not mixed together until the pellets are melted. (A72-74.) The district court's construction is erroneous for two reasons. First, the term "composition" appears in the preamble and does not limit the claims. Second, even if "composition" is limiting, the district court's importation of the requirement that a composition must be a blend was erroneous.

### A.    "Composition" in the Preamble is Not Limiting

"Generally, the preamble does not limit the claims." *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1346 (Fed. Cir. 2002); *Am. Med. Sys., Inc. v. Biolitec, Inc.*, 619 F.3d 13541358-59 (Fed. Cir. 2010). The preamble only limits when it recites essential structure or when it was relied on to distinguish prior art during prosecution. *Id*. Here, neither exception applies. The preamble of the

claims—"a composition for containers"—does not recite essential structure of the claims and was not relied upon to distinguish prior art.

The body of the claims recites all the elements of the invention. In claim 1, the invention is a copolyester comprising a metal sulfonate salt, a partially aromatic polyamide, and a cobalt salt. The specification is consistent, stating: "[c]ompositions of the present invention comprise: polyester, partially aromatic polyamide, ionic compatibilizer, and a cobalt salt." (A237 (3:24-26).) In both cases, the word "composition" "merely gives a descriptive name to the set of limitations in the body of the claim that completely set forth the invention," and so does not limit the claims. *IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1434 (Fed. Cir. 2000); *see also Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1347-48 (Fed. Cir. 2012). It does not matter that the preamble recites containers as an intended use for the claimed invention. Simply stating a use in the preamble does not limit the claim. *Catalina Mktg., Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002). The analysis also does not change because some of the dependent claims reference "the composition" of claim 1. The term is not "necessary to give life, meaning, and vitality to the claim." *Am. Med., Sys.*, 618 F.3d at 1358.

## B. "Composition" is Not Limited to a Blend

If this Court finds it necessary to construe "composition," the term should be construed consistent with its broad ordinary meaning, not in way that unduly narrows the invention. Claim construction "must begin and remain centered on the language of the claims themselves." *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1370 (Fed. Cir. 2005). The claims recite a ***composition***, not a blend, as the district court's construction requires. The term "composition" has been read very broadly in a number of technology areas. *See, e.g., Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1370 (Fed. Cir. 2007) (construing "composition" to encompass pellets in the context of composite chemistry); *Sourceone Global Partners LLC v. KGK Synergize, Inc.*, 2010 WL 2232944, at *4, *7 (N.D. Ill. June 3, 2010) (construing "composition" in the pharmaceutical context not be limiting and to mean a formulation or preparation); *Dey L.P. v. Teva Parenteral Medicines, Inc.*, 2011 WL 2461888, at *10-11 (N.D. W.Va. June 17, 2011) (concluding that "pharmaceutical composition" gives only "general context" and is not a "substantive limitation" and construing it as "a medicinal formulation containing an active drug and inert excipients").

The '216 patent is directed to polymer compositions. The packaging of these polymers is irrelevant. Polymers, either blends or not, are commonly known to be extruded or co-extruded into threads that are then cut into pellets for sale,

distribution, and transportation.  These pellets, whether co-extruded in multiple

layers or extruded in one blend, are commonly referred to as compositions.  For

example, M&G's U.S. Patent No. 8,436,080, admittedly covering its BiCo pellet

(Brief at 16), is titled "***Composition*** for maintaining good color when thermally

treating polyester-polyamide blends."  In the specification, M&G describes the

"BiCo" technology and explains that the composition can be more than two

components or layers: "The article can comprise the critical elements which exist

in a two component form. … The critical elements of the ***composition*** can also be

present as more than two components."  (A14905-15 (A14911 at 7:15-24).)

The district court and M&G heavily rely on *PIN/NIP, Inc. v. Platte Chem.*

*Co.*, which construes the term "composition" in the context of different

technology, a different patent, and different claims.  304 F.3d 1235 (Fed. Cir.

2002).  As *PIN/NIP* recognized, "the construction of a term in a patent claim is a

highly contextual exercise that is dependent upon the content of the particular

patent in which the term appears."  *Id.* at 1244; s*ee also Allergan, Inc. v. Sandoz*

*Inc.*, Civ. No. 6:11-cv-441, 2013 WL 139350, at *4-5 (E.D. Tex. Jan. 10, 2013)

(declining to follow *PIN/NIP*).  The patent at issue in *PIN/NIP* related to chemicals

used to inhibit sprout development.  *PIN/NIP,* 304 F.3d at 1238.  It was known in

the art to spray two chemicals on at different times, but the invention was to mix

the two chemicals together and apply them at once.  *Id.* at 1239, 1244.  To

distinguish the claimed invention from the prior art, this Court construed the claimed compositions to require mixing. *Id.* at 1245. Here, unlike in *PIN/NIP*, the claimed components were not used together in an "un-mixed" fashion (or any fashion) in the prior art, and there is no reason to deviate from the general rule that the preamble is non-limiting or to apply a restrictive definition to "composition."

The '216 patent discusses using a blend (either in melt or pellet form), but such preferred embodiments and illustrative examples do not limit broader claim language absent a clear disclaimer in the specification. *See Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1352 (Fed. Cir. 2010); *Intamin Ltd. v. Magnetar Techs., Corp.*, 483 F.3d 1328, 1335 (Fed. Cir. 2007); *Eolas Techs. Inc. v. Microsoft, Corp.*, 399 F.3d 1325, 1336 (Fed. Cir. 2005). With no express disclaimer in the '216 patent, requiring a composition to be a blend (and excluding embodiments like co-extruded layers) is unduly limiting.

## C. Under the Proper Construction, M&G's PoliProtect Directly Infringes

As discussed above, the district court found that no other factual issues exist as to the infringement of PoliProtect. (*See supra* Counterstatement of Facts Section III.E, III.H; A76-81.) "When [the Federal Circuit] determine[s] on appeal that a trial judge has misinterpreted a patent claim, [the Court] independently construe[s] the claim to determine its correct meaning, and then determine[s] if the facts presented at trial can support the judgment as a matter of law." *Callicrate v.*

43

*Wadsworth Mfg., Inc.*, 427 F.3d 1361, 1372-73 (Fed. Cir. 2005) (citation omitted). Under the proper construction of "composition," PoliProtect in its pellet form is a composition. The facts presented in the record below support a judgment of direct infringement and there is no reason to remand the case for further fact finding. (A76-A81.) This Court should direct a verdict of direct infringement.

This finding provides an alternative ground for affirming the infringement finding and is properly raised as such. *See Allergan, Inc. v. Sandoz Inc.,* Appeal Nos. 2011-1619, -1620, -1635, -1639, 2012 U.S. App. LEXIS 6926 (Fed. Cir. Apr. 4, 2012) (order dismissing cross appeal).

## V. The District Court Did Not Err In Denying M&G Summary Judgment on Lack of Enablement

M&G's lack of enablement argument on appeal (Brief at 41-43) is different from that presented to the district court and conflates the issues of unexpected results (relevant to nonobviousness) and enablement. The district court granted INVISTA's motion for summary judgment that the claims were enabled regarding M&G's since-abandoned sodium acetate theory and denied both INVISTA's and M&G's remaining motions for summary judgment on enablement, thereby leaving the issues for the jury. (A92-98.) The jury found the claims enabled. (A10689-91.) M&G now only appeals the district court's ***denial*** of M&G's summary judgment motion. (Brief at 43.) This Court reviews *de novo* whether an issue of fact existed at the time of summary judgment. *Karlin Tech., Inc. v. Surgical*

*Dynamics, Inc.*, 177 F.3d 968, 974 (Fed. Cir. 1999); *see also Harrods*, 302 F.3d at 242.

### A.     M&G's New Enablement Argument is Untimely

Though M&G appeals the district court's denial of its summary judgment motion, M&G's new theory of lack of enablement based on the full scope of metal sulfonate salts not showing the unexpected results does not appear in M&G's expert reports, was not raised at summary judgment, was not presented at trial, and was not argued in post-trial motions.  (A3320-65; A3474-535; A11083-1108.)  For this reason alone, the Court should refuse to consider the argument.  *Energy Transp. Grp., Inc. v. William Demant Holding A/S*, 697 F.3d 1342, 1357 (Fed. Cir. 2012); *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1426 (Fed. Cir. 1997).

### B.     The '216 Patent Need Not Enable the Unexpected Result of Decreased Yellowness

M&G's new theory fails for the same reasons its previous theory did.  The claims of the '216 patent covers compositions for containers comprising three components—the unexpected result of decreased yellowness is not specified in the asserted claims.  (A242.)  This Court has confirmed that enablement is analyzed based on the invention **as claimed**.  *Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 449 F.3d 1209, 1224 & n.2 (Fed. Cir. 2006); *DeGeorge v. Bernier*, 768 F.2d 1318, 1324 (Fed. Cir. 1985); MPEP §2164.08.  There is ample evidence that what is

claimed—a three component composition—is enabled by the specification. This was Dr. Turner's opinion, as the district court recognized in considering M&G's previous enablement theory. (A94 (citing A3827-28).) M&G's own expert admitted that his graduate students, who meet the definition of a person of ordinary skill in the art, could follow the procedures outlined in the patent specification to make a composition that includes a partially aromatic polyamide, a copolyester comprising a metal sulfonate salt, and a cobalt salt, as described in the claims of the '216 patent. (A14638-39 (293:13-294:14).) The patent expressly teaches which metal ions to use, saying "[t]he metal ion of the sulfonate salt may be Na+, Li+, K+, Zn++, Mn++, Ca++ and the like." (A237 (4:65-66).) This evidence, which supported the district court's denial of M&G's previous enablement theory, demonstrates at least an issue of fact that the '216 patent enables the claimed compositions. *Green Edge Enter., LLC v. Rubber Mulch Etc., LLC*, 620 F.3d 1287, 1299 (Fed. Cir. 2010); *Liquid Dynamics Corp.,* 449 F.3d at 1224 & n.2.

Tellingly, all of the cases M&G cites relate to unexpected results as objective indicia of non-obviousness—not to enablement. (Brief at 41-43.) The applicants presented the synergistic decrease in yellowness to the Patent Office ("PTO") as an unexpected result showing non-obviousness. (A747-56.) INVISTA introduced evidence of the synergy at trial for the same purpose. (A13608-10 (906:20-915:14); A13366-67 (329:18-330:10, 330:18-331:2, 332:1-334:22);

A14106-09; A14121-27.)  The unclaimed synergy has no bearing on enablement of the asserted claims.  *Liquid Dynamics Corp.,* 449 F.3d at 1224 & n.2; *Singh v. Brake*, 317 F.3d 1334, 1346 (Fed. Cir. 2003).

## VI.   Substantial Evidence Supports the Jury's Verdict on Obviousness

The non-obviousness of the '216 patent is supported by a jury verdict.  "It is only in rare instances that a jury's verdict in a civil case should be overturned."  *Pitts v. Delaware*, 646 F.3d 151, 152 (3d Cir. 2011).  In reviewing the denial of a motion for JMOL under Third Circuit law, the appellate court must affirm if upon "viewing the evidence in the light most favorable to the [verdict winner] and giving it the advantage of every fair and reasonable inference, there is sufficient evidence from which a jury reasonably could find" for the verdict winner.  *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993).

M&G fails to apply the proper standard of review applicable to a denial of JMOL of invalidity on the basis of obviousness.  The question M&G must address (but does not) is whether there was substantial evidence to support the jury's implicit fact finding and whether those findings support the legal conclusion of non-obviousness.  *See LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc.*, 275 F.3d 1347, 1353 (Fed. Cir. 2001).  Instead, M&G ignores the evidence supporting the jury's verdict entirely and improperly asks this court to reweigh M&G's evidence (Brief at 44).  *Leader Techs., Inc. v. Facebook, Inc.*, 678 F.3d 1300, 1308

(Fed. Cir. 2012). For example, M&G cites a demonstrative slide from its expert, Dr. Moore, and argues it "shows the level of detail with which he supported his opinion." (Brief at 44.) This is exactly the type of weight and credibility determination that is in "the special province of the trier of fact." *Inwood Labs., Inc. v. Ives Labs, Inc.*, 456 U.S. 844, 856 (1982).

### A.    Substantial Evidence Supported the Jury's Findings Regarding M&G's Asserted References

M&G only discusses one obviousness combination—EP 0301719 ("the '719 patent") with JP 2663578 ("the '578 patent"). (Brief at 43-44.) Both the jury and the district court found the evidence at trial demonstrated that a person of ordinary skill in the art would have had no reason or motivation to combine these patents, both of which were also before the Examiner, with any expectation of achieving a balance between good barrier properties and good color and clarity. The finding is supported by substantial evidence. Dr. Turner identified the claimed elements missing from each of the references and testified there was "no motivation to put [the references] together." (A13591 (838:22-839:1); A13603-04 (885:8-890:10).) While the '719 patent generally discloses an oxygen scavenging system for MXD6 and a cobalt salt, it does not disclose the use of a copolyester including a metal sulfonate salt and does not teach reduction in the haze or yellowness of containers made from PET. (A13603 (885:8-887:1).) Further, the '578 patent does not disclose a cobalt salt or suggest the use of a cobalt salt with a copolyester including

48

a metal sulfonate salt and MXD6 to reduce haze or yellowness. (A13603-04 (888:19-889:17).)

Dr. Turner explained that there is no motivation to combine the '719 and '578 patents because neither teach or suggest to one of ordinary skill in the art that a composition containing a copolyester including a metal sulfonate salt, MXD6, and a cobalt salt would improve barrier properties while reducing haze and yellowness in monolayer PET preforms and bottles. (A13603-04 (887:25-888:2, 889:20-890:6)); *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1334 (Fed. Cir. 2013). Instead, the conventional wisdom was that polyester and MXD6 would yield a yellow and hazy bottle. (A11304 (272:8-273:8).) Dr. Turner also testified in detail about non-obviousness in view of the other two combinations M&G raises on appeal. (A13595-97 (855:16-856:5, 856:11-18, 857:10-12, 857:25-860:22, 861:20-862:2); A13604-05 (891:2-25, 892:13-24, 893:23-894:2); A13601 (878:11-879:3, 880:6-21); A13607-08 (903:21-905:4-11).) Dr. Moore, on the other hand, conducted a "word search" at trial (A13532 (745:5-11); A13529 (733:4-7)), using impermissible hindsight to identify the '216 patent elements from disparate prior art references. *Grain Processing Corp. v. Am. Maize-Products Co.*, 840 F.2d 902, 907 (Fed. Cir. 1988)

As the district court recognized, when viewing the record in the light most favorable to INVISTA, the verdict winner, "the jury found that the claims of the

'216 patent were not obvious in view of the combination[s] presented" and

therefore "credited the testimony of [INVISTA's] expert regarding motivation to

combine above that of [M&G's] expert." (A138; A141; A144-45.) Thus, "[w]hile

[M&G] may disagree with the jury's decision, the record at bar ***does*** provide

substantial evidence to support such a verdict." (A144-45.)

### B.   M&G Waived the Argument That Unexpected Results Are Not Commensurate In Scope with the Claims

Continuing its pattern of belatedly raising new arguments, M&G argues for

the first time on appeal that the asserted claims are invalid as obvious because the

claims are "not commensurate in scope" with INVISTA's unexpected results.

(Brief at 47-48.)  M&G never presented its "commensurate in scope" argument to

the jury or to the district court, let alone disclose it to INVISTA during discovery.

M&G's expert Dr. Moore did not testify that "other alkali metal sulfonate salts will

behave differently" or that a person of ordinary skill in the art would not expect all

alkali metals to show the same unexpected results. (*Id.*)  Nor did M&G raise this

argument in its JMOL briefs. (A11083-110; A11752-69.)  This—again—is

precisely the sort of argument raised for the first time on appeal that this Court has

refused to hear. *Energy Transp. Grp., Inc.,* 697 F.3d at 1357.

At trial and on JMOL, M&G's argument against unexpected results was that

sodium acetate, which is added as buffer in making PET bottles, is what causes

reduced yellowness, not the claimed invention.  M&G thus made the tactical

decision only to present evidence that "there is no nexus between any claimed feature [of the '216 patent] and the reduction of yellowness because to achieve it, sodium acetate was required (but was not claimed)." (A11105; A11762 (citing A13517-19 (685:18-691:1, 691:17-24), A13537 (763:20-765:9)); A134-35.) Having lost, M&G cannot cite miscellaneous statements from a declaration and a non-infringement (not invalidity) report (Brief at 48), and shift its position on appeal to argue that the jury and the district court got the obviousness decision wrong because they failed to consider an argument M&G never made. *Energy Transp. Grp., Inc.,* 697 F.3d at 1357.

## C. Substantial Evidence Supported the Jury's Finding of a Nexus between Objective Indicia and the Claimed Invention

"[C]onsideration of the objective indicia is a part of the whole obviousness analysis, not just an afterthought." *Leo Pharm. Prod., Ltd. v. Rea*, 726 F.3d 1346, 1357 (Fed. Cir. 2013). Objective indicia evidence "can be the most probative evidence of non-obviousness in the record, and enables the . . . court to avert the trap of hindsight." *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1310 (Fed. Cir. 2010) (citation omitted); *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1079-80 (Fed. Cir. 2012) (holding "that objective evidence be considered before making an obviousness determination"). Moreover, on review of a denial of JMOL, "the factual inferences and credibility determinations predicate to the jury's obviousness determination are

drawn in favor of the verdict winner[,]" INVISTA. *Rothman v. Target Corp.*, 556 F.3d 1310, 1317 (Fed. Cir. 2008).

### 1. Nexus exists for unexpected results

INVISTA presented substantial evidence to support the jury's verdict, which implicitly found a nexus between the unexpected results and the '216 patent inventions. Dr. Liu explained that, when he made preforms and bottles from copolymers of PET/SIPE, MXD6 and cobalt salt (the inventive limitations), he discovered that the formulation significantly and synergistically reduced yellowness. (A13366 (329:18-25, 330:4-10, 330:18-331:2); A13367 (332:1-334:22); A13369 (342:6-15).) The significant reduction in yellowness was so unexpected and exciting that Dr. Liu documented the results in writing and photographs of the preforms and bottles he made. (A14121-27.) Dr. Turner confirmed the synergistic effect and that it was a surprise. (A13608 (906:9-907:23).) M&G wholly ignores this evidence. This testimony more than satisfies the "substantial evidence" standard, and the Court should not disturb the jury's findings on unexpected results. *See, e.g.*, *Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 997-98 (Fed. Cir. 2009).

Objective indicia of non-obviousness "need only be 'reasonably commensurate with the scope of the claims.'" *Rambus, Inc. v. Rea*, 731 F.3d 1248, 1257 (Fed. Cir. 2013); *Genetics Inst., LLC v. Novartis Vaccines & Diagnostics,*

*Inc.*, 655 F.3d 1291, 1309 (Fed. Cir. 2011). While the claimed sulfonate salts include a range of metals, the evidence demonstrates "an adequate basis to support the conclusion that other embodiments falling within the ['216 patent] claim[s] will behave in the same manner," and establishes that the unexpected results are commensurate with the scope of the claims. *In re Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011). The '216 patent discloses six metal ions of the sulfonate salt: Na+, Li+, K+, Zn++, Mn++, and Ca++. INVISTA tested the sodium and zinc sulfonate salts, which both exhibited the unexpected results reported in the patent. (*E.g.*, A238 (5:24-30); A240-41(10:60-11:11); A11495-96 (332:2-338:25); *see* A14106-09; A14121-27.) INVISTA submitted its unexpected results evidence to the PTO, which subsequently issued a notice of allowance. (A2364-87; A2390-93.)

Further, M&G's PoliProtect products contain lithium sulfonate salt and also exhibit reduced haze and yellowness. (A13725.) M&G markets and sells these products as "having better clarity than [its] competitors' product." (A13491 (581:9-15); A13722-49.) And, as Dr. Turner testified, the data in the '216 patent "clearly show a strong synergistic effect" that is "validate[d]" by the PolyShield® and PoliProtect products, which are successful because of the discovery in the '216 patent. (A13608 (906:24-907:16).) M&G presented no evidence to the contrary. Thus, even if M&G had presented this argument at trial, there is more than sufficient evidence from which the jury could have found INVISTA's unexpected

results evidence commensurate in scope with the claims. *See Lightning Lube*, 4 F.3d at 1166.

M&G's reliance on *In re Peterson*, 315 F.3d 1325 (Fed. Cir. 2003), *In re Grasselli*, 713 F.2d 731 (Fed. Cir. 1983) and *In re Greenfield*, 571 F.2d 1185 (C.C.P.A. 1978) is misplaced. In these cases, the patent applicants attempted but failed to rebut the *prima facie* case of obviousness during prosecution (where a burden shifting framework is used) by showing unexpected results. 315 F.3d at 1229-31; 713 F.2d at 743; 571 F.2d at 1187-88. Unlike *Peterson*, *Grasselli*, and *Greenfield*, INVISTA provided unexpected results evidence to the PTO and the PTO found the unexpected results to be commensurate in scope with the claims and issued a notice of allowance. Accordingly, the holdings in *Peterson*, *Grasselli*, and *Greenfield* do not apply in this case.

## 2. Nexus exists for commercial success

Contrary to M&G's unsupported assertion that INVISTA must present market share data to show commercial success (Brief at 47), "sales figures alone are . . . evidence of commercial success." *Tec Air, Inc. v. Denso Mfg. Michigan Inc.*, 192 F.3d 1353, 1361 (Fed. Cir. 1999); *Neupak, Inc. v. Ideal Mfg. & Sales Corp.*, 41 Fed. App'x 435, 440 (Fed. Cir. 2002). At trial, the evidence demonstrated that INVISTA's PolyShield® and M&G's PoliProtect (which practice the claims of the '216 patent) are commercially successful. Between 2005

and 2013, PolyShield® for blending with MXD6 had worldwide sales of $200 million, and INVISTA considered PolyShield® one of the most successful products across its six specialty materials businesses.  (A13344 (242:21-23).)  M&G's global director of sales and marketing, Mr. Fournier, testified that M&G sold more than $23 million of PoliProtect products in the United States between its introduction in 2009 and August 2012, with increasing sales each year.[4]  (A13490 (577:1-18).)

"A prima facie case of nexus is made when the patentee shows both that there is commercial success, and that the product that is commercially successful is the invention disclosed and claimed in the patent."  *Crocs*, 598 F.3d at 1310-11.  The unrebutted trial testimony demonstrated that PolyShield® blended with MXD6 is a commercial embodiment of the '216 patent.  (A13612 (924:14-23).)  And the infringing PoliProtect products are commercial embodiments of the '216 patent.  Nexus therefore was presumed.

## VII.   The District Court Properly Granted a Permanent Injunction

The grant or denial of an injunction is reviewed for abuse of discretion.  *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1338-39 (Fed. Cir. 2003).  The

---

[4] Because the district court bifurcated damages from liability, INVISTA only received a portion of M&G's sales data.  M&G, however, continued to sell PoliProtect until it was enjoined on May 2, 2014.  Thus, the $23 million sales figure does not accurately reflect M&G's total sales.

legal conclusions underlying an injunction are reviewed *de novo*, and the factual

findings for clear error, "[i]n deference to the unchallenged superiority of the

district court's fact-finding ability." *Salve Regina Coll. v. Russell*, 499 U.S. 225,

233 (1991).

### A.    Auriga Will Be Irreparably Harmed Absent an Injunction

The record before the district court included evidence that PolyShield® and

Oxyclear®, sold by Auriga in the United States, directly compete with PoliProtect

in the United States and globally, and that absent a permanent injunction, Auriga

will suffer irreparable injuries including lost sales and market share, lost future

market opportunities in the developing barrier polyester market, and a forced loss

of its exclusive license.  (A14484-94; A11053-76 (A11063-71).)  These injuries

cannot be compensated by money damages.  *Douglas Dynamics, LLC v. Buyers*

*Prods. Co.*, 717 F.3d 1336, 1344 (Fed. Cir. 2013); *Robert Bosch LLC v. Pylon Mfg.*

*Corp.*, 659 F.3d 1142, 1155-56 (Fed. Cir. 2011).  The district court properly found

that Auriga will be irreparably harmed absent an injunction, and that legal

remedies are inadequate.  (A116-60 (A152-56).)

Auriga and M&G are direct competitors in the United States and offer the

only monolayer polyester barrier resins available in the market.  (A14487-88

(¶¶11-13); A13344 (243:20-23); A13490 (575:24-576:16); A11063-65.)  Other

available packaging products, including glass, metal, and multilayer and coating

technologies, have significant disadvantages compared to PolyShield® and

Oxyclear®, and PoliProtect.  (A14487-88 (¶¶12-13).)  Mr. Fournier testified that

INVISTA and Auriga (referred to as its parent company, Indorama) were M&G's

only competitors in the barrier polyester business.  (A13490 (575:24-576:16).)

██████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

████████████████████  M&G could have submitted a declaration during

briefing of INVISTA's motion, but failed to do so.  (A11320-45.)  This Court "has

no authority to supplement a record or take additional evidence to correct a failure

of proof" and its review of the district court's injunction decision is based on the

record presented to the district court at that time.  *Schaefer Fan Co., Inc. v. J&D

Mfg.*, 265 F.3d 1282, 1290-91 (Fed. Cir. 2001); *Harrods,* 302 F.3d at 242.  Even

considering M&G's untimely declaration, the weight of the evidence supports the

district court's finding of irreparable harm.  (A14487-88 (¶¶11-13); A13344

(243:20-23); A13490 (575:24-576:16); A11063-65.)

The district court's decision finding a nexus between the alleged harm and

infringement (A153) is well-supported.  PoliProtect embodies the composition

claimed in the '216 patent when melted by M&G's customers.  (A81; A13626

(977:8-978:23).)  When a product embodies the invention disclosed and claimed in a patent, it is presumed that the product's commercial success is due to the patented invention.  *J.T. Eaton & Co., Inc. v. Atl. Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997).  The BiCo feature of PoliProtect relates only to ease of handling for customers (Brief at 51)—the most important characteristics for customers (barrier properties and bottle aesthetics) are the result of the claimed invention. (A13585 (816:11-21); A13613 (926:16-927:19).)

## B.    The Public Interest Does Not Favor M&G

The district court considered M&G's arguments concerning customer harm, including that the customers may suffer costs associated with qualifying a new product (A11342-43), balanced these harms against the public's interest in upholding patent rights, and found that the public interest does not favor M&G. (A157.)  As this Court has explained, "public policy favors protection of the rights secured by … valid patents."  *Smith Int'l., Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1581 (Fed. Cir. 1983).  INVISTA invested years of research and millions of dollars to develop the technology claimed in the '216 patent (A11074; A13351(268:7-19); A13352 (274:10-24); A13357-58 (295:6-25); A13371-72 (351:23-355:4)); the public interest favors the protection of these investments which are necessary for the development of new products that benefit society.  *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 480 (1974).

To the extent M&G's customers may suffer harm as a result of the transition from PoliProtect, it is because M&G misled them, told them that INVISTA did not win the case, and reassured them that M&G could continue to supply them. (Doc. 28 at 5-6; Doc 15, Ex. A; *Id.*, Ex. B ¶¶5-6.) M&G's argument that INVISTA does not practice the '216 patent (Brief at 52) is wrong. As M&G knows, Auriga actively markets and sells PolyShield® and Oxyclear® in the United States, and those products are readily available. (A14485-87 (¶¶3-9); Doc. 28 at 17-20; Doc. 28, Ex. 21 ¶¶2-3.) Further, M&G's customers can transition to Auriga's products in approximately three months, and began doing so when the injunction went into effect on May 2, 2014. (Doc. 28 at 17-20; *Id.*, Ex. 21 ¶¶ 8-10.)

Notably, this Court already considered M&G's arguments and found that the public interest did not weigh in favor of staying the injunction. (Doc. 31 at 2; Doc. 3 at 12-16; Doc. 28 at 14-20.) The district court did not abuse its discretion in granting INVISTA injunctive relief. *Oakley*, 316 F.3d at 1338-39; *Salve Regina*, 499 U.S. at 233.

## VIII. The Injunction is Properly Tailored

As the district court recognized, M&G's arguments regarding the scope of the injunction are "basically asking to limit the injunction so that, to some extent, [M&G] can continue doing what it has always done." (A14917-23 (A14922 at 24:18-25:7).) PoliProtect has no substantial non-infringing use; "the only

59

'practical or worthwhile' use of the PoliProtect products is for them to be melted"

by M&G's customers, which directly infringes the '216 patent. (A75-76; A82-83.)

M&G did not appeal that finding. Prior to the injunction, there was substantial

direct infringement in the U.S.— ███████████████████████████

████████████████████████████████████████████████████████

███████████████ The district court properly enjoined M&G's activities that induced

and contributed to that infringement. (A81-84; A164-66.)

M&G's argument that the injunction should only prohibit sales to U.S.

customers—which would allow M&G to manufacture PoliProtect at its West

Virginia facility—is wrong. (Brief at 53-54.) Manufacture of PoliProtect

contributes to infringement and induces infringement by others, and the district

court properly enjoined that infringing activity. *Metabolite Labs., Inc. v.

Laboratory Corp. of Am. Holdings*, 370 F.3d 1354, 1372 (Fed. Cir. 2004);

*Tristrata Tech., Inc. v. Mary Kay, Inc.*, 423 F. Supp. 2d 456, 470-71 (D. Del.

2006). It would be almost impossible to police M&G's compliance with an

injunction that permitted manufacture for sale to some customers but not to others.

The district court considered M&G's arguments concerning the scope of the

injunction in briefing (A157), at a hearing, and in letters after granting the

injunction (Doc. 28, Ex. 13-15), and did not abuse its discretion by issuing the

injunction. *Oakley*, 316 F.3d at 1338-39; *Salve Regina*, 499 U.S. at 233.

The district court enjoined M&G from exporting PoliProtect under §271(f) in response to M&G's representation, made for the first time after the district court granted the injunction, that M&G would read an injunction on manufacturing as allowing M&G to manufacture for export. (A14918 (9:2-10); A13039-40; A13075-76; A164-65.) "The district court has power to grant an injunction in accordance with the principles of equity to prevent the violation of any rights secured by patent." 35 U.S.C. § 283; *Pac-Tec, Inc. v. Amerace Corp.*, 903 F.2d 796, 802 (Fed. Cir. 1990). This decision was also not an abuse of discretion.

## IX. M&G's Request for a Transition Period is Moot

This Court has already denied M&G's request to stay the injunction pending appeal. (Doc. 31 at 2.) M&G's request for a transition period (Brief at 54) is moot, because M&G's customers can transition to alternative products in approximately three months, and began doing so when the injunction went into effect on May 2, 2014. (Doc. 28 at 17-20; *Id.*, Ex. 21 ¶¶8-10.) M&G's customers should be transitioned to alternative products by the time of oral argument in this appeal.

## X. The District Court Did Not Abuse Its Discretion by Denying M&G's Motion to Amend and Motion for Reargument

M&G's pattern of tardiness is further evidenced by the procedural decisions raised by M&G in the final three pages of its Brief. This Court applies the procedural law of the Third Circuit to review a district court's denials of a motion

to amend the pleadings and a motion for reargument.  *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1359 (Fed. Cir. 2011); *Delaware Valley Floral Grp., Inc. v. Shaw Rose Nets, LLC*, 597 F.3d 1374, 1378-79 (Fed. Cir. 2010).  A district court's denials of both motions are reviewed for abuse of discretion.  *Douglas v. Owens*, 50 F.3d 1226, 1235 (3d Cir. 1995); *Long v. Atl. City Police Dep't*, 670 F.3d 436, 447-48 (3d Cir. 2012).

M&G's first motion to amend to allege inequitable conduct, filed on the last day to amend the pleadings under the scheduling order (A330-36 (A333-34 ¶4)), accused INVISTA's patent attorney of perpetrating fraud on the PTO.  (A370-371; A415-54 (A425 ¶72).)  The magistrate judge recommended denying the motion because M&G did not meet the pleading standards under *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312 (Fed. Cir. 2009).  (A8162-92 (A8176, A8181-87).)  M&G did not object to the recommendation, which the district court subsequently adopted.  (A1.)  On June 19, 2013, more than eight months after discovery closed and one month before trial, M&G moved to amend to add a different set of allegations accusing a different person, INVISTA's patent liaison Dr. Scantlebury, of inequitable conduct.  (*See, e.g.*, A8722-38 (A8732-33); A14734-89 (A14744 ¶72).)  The district court acted well within its discretion in holding that M&G, having failed to offer sufficient explanation for its undue delay, did not meet the good cause requirement of Fed. R. Civ. P. 16(b), and that

INVISTA would be unfairly prejudiced by the untimely allegations. (A158-59); *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1354 (Fed. Cir. 2009); *Cent. Admixture Pharmacy Servs., Inc. v. Advanced Cardiac Solutions, P.C.*, 482 F.3d 1347, 1357 (Fed. Cir. 2007).

Likewise, the district court acted within its discretion in denying M&G's motion for reargument. In August 2012, INVISTA determined that several produced documents were privileged and, pursuant to the Protective Order, notified M&G of the inadvertent production and requested return or destruction of the documents. (A14646-69 (A14661-62 ¶9); A1681-709; A1710-14; A1716-24.) M&G had five days to file a motion to compel production of the documents, but failed to do so. (A14661-62 (¶9).) The magistrate judge permitted M&G to file a belated motion nevertheless. (A9418 n.1.) The district court overruled the magistrate judge, holding that M&G was required to follow the Protective Order it jointly negotiated and submitted to the district court. (A13253-58 (A13258 19:7-18).) The district court did not abuse its discretion by enforcing its own orders. *See Eagle Comtronics, Inc. v. Arrow Commc'n Labs., Inc.*, 305 F.3d 1303, 1314 (Fed. Cir. 2002).

## **CONCLUSION**

For the reasons above, INVISTA and Auriga respectfully request that this Court affirm the district court's judgment.

Dated: May 27, 2014


By: */s/ Jeffrey T. Castellano*                    By:  */s/ Robert M. Oakes*

　　　John W. Shaw                                       William J. Marsden, Jr.
　　　Jeffrey T. Castellano                             Douglas E. McCann
　　　SHAW KELLER LLP                                    Martina Tyreus Hufnal
　　　300 Delaware Ave., Suite 1120                      Robert M. Oakes
　　　Wilmington, DE 19801                               Michelle Nerozzi-Ankenbrand
　　　(302) 298-0700                                     FISH & RICHARDSON P.C.
　　　　　　　　　　　　　　　　　　　　　　　　　　　　222 Delaware Avenue, 17th Floor
　　　　　　　　　　　　　　　　　　　　　　　　　　　　Wilmington, DE 19801
　　　　　　　　　　　　　　　　　　　　　　　　　　　　(302) 652-5070


　　*Attorneys for Appellee*                            *Attorneys for Appellee*
　　*Auriga Polymers Inc.*                              *INVISTA North America S.à r.l.*

**FORM 30. Certificate of Service**

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

# CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on by:

| May 28, 2014 |

☐ US mail
☐ Fax
☐ Hand
☒ Electronic Means
    (by email or CM/ECF)

| Robert M. Oakes |  | /s/ Robert M. Oakes |

Name of Counsel                            Signature of Counsel

Law Firm   Fish & Richardson P.C.

Address   222 Delaware Avenue, 17th Floor, PO Box 1114

City, State, ZIP   Wilmington, DE  19899-1114

Telephone Number   302-652-5070

FAX Number   302-652-0607

E-mail Address   oakes@fr.com

NOTE: For attorneys filing documents electronically, the name of the filer under whose log-in and password a document is submitted must be preceded by an "/s/" and typed in the space where the signature would otherwise appear. Graphic and other electronic signatures are discouraged.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1.   This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

__X__   The brief contains <u>13,429</u> words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

_____   The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

__X__   The brief has been prepared in a proportionally spaced typeface using <u>MS Word 2010</u> in a <u>14</u> point <u>Times New Roman</u> font, or

_____   The brief has been prepared in a monospaced typeface using _____ _____ in a _____ characters per inch _____ font.

Dated:  May 27, 2014

*/s/ Robert M. Oakes*
Robert M. Oakes
FISH & RICHARDSON P.C.

*Attorneys for Appellee*
*INVISTA North America S.à r.l.*